## POLLACK v. POLLACK.

### No. 1471—5709.

Commission of Appeals of Texas, Section A.

June 10, 1931.

Harry P. Lawther, of Dallas, for plaintiff in error.

Coke & Coke and Thomas G. Murnane, all of Dallas, for defendant in error.

### CRITZ, J.

The opinion of the Court of Civil Appeals is reported at 23 S.W.(2d) 890. In the interest of brevity, we refer to and adopt the statement made by that court. However, in order that this opinion be as nearly complete as possible, we make the following statement of the nature and result of the suit:

It seems that on and prior to January 21, 1911, Henry and Charles Pollack, who are brothers, were partners in a trunk factory and certain other properties. On said date they entered into the following contract in writing:

" 'Whereas, Henry Pollack and Charles Pollack, of the County and State aforesaid, are jointly seized and possessed of certain property, both real and personal, in the City and County of Dallas, and State of Texas, and are desirous of adjusting and separating their said interests so that the title to said property may be held in severalty by the said Henry Pollack.

" 'Now, therefore, this agreement entered into this the twenty first day of January, 1911, between the said Henry Pollack, of the one part, and Charles Pollack, of the other part, witnesseth:

" 'That the said Henry Pollack, for himself and his heirs, for the consideration hereinafter named, doth covenant and agree with the said Charles Pollack that he, the said Henry Pollack, during his natural life, shall and will pay to the said Charles Pollack, for the period of the said Charles Pollack's natural life, the sum of Five Thousand ($5,000.-00) Dollars yearly; said sum to be paid to him in monthly payments of $416.66⅔; the first payment to be made to him on the day of the date hereof, and the remainder on the first of each and every month hereafter during the life of the said Charles Pollack.

" 'It is expressly understood and agreed that upon the death of the said Charles Pollack, the said Henry Pollack surviving, the obligation herein assumed on the part of the said Henry Pollack is to terminate and the said payments are to cease and the heirs, devisees, legatees or personal representatives of

the said Charles Pollack are to have no claim against the said Henry Pollack, or upon his property or estate. In the event the said Henry Pollack should die before the death of the said Charles Pollack, the said payments of $416.66⅔ each month are to cease, and the said Henry Pollack, for himself and his heirs, covenants and agrees with the said Charles Pollack that in lieu thereof, he, the said Henry Pollack, will bequeath and devise free of all claims and incumbrances to the said Charles Pollack property, real or personal or both, to the value of One Hundred Thousand ($100,000.00) Dollars to take effect upon the death of the said Henry Pollack, and to be valued at its market value as of the date of the death of the said Henry Pollack, and if the said Charles Pollack and the personal representatives or devisees and legatees of the said Henry Pollack cannot agree upon a division of the estate of the said Henry Pollack so that the property to the value of $100,000.00 may be set aside in kind and in severalty to the said Charles Pollack, then so much of the real or personal property belonging to the estate of Henry Pollack is to be sold as that the proceeds or a portion thereof will be sufficient, either of itself or together with the monies and personal property which the said Charles Pollack is willing to accept to make up said value of $100,000.00.

"'And the said Charles Pollack, in consideration of the covenants and agreements hereinbefore contained on the part of the said Henry Pollack, and which on his part are to be done and performed, doth hereby bargain, sell, transfer and convey to the said Henry Pollack all of his right, title and interest in and to all of the property, both real and personal, wherever situated, in which the said Charles Pollack and Henry Pollack are now jointly interested, embracing all the said Charles Pollack's interest in the Henry Pollack Trunk Company, the Harris Millinery Company, The Donovan Undertaking Company, and all real estate now and jointly owned by the said Henry and Charles Pollack.'"

For convenience we shall hereafter refer to Henry Pollack as Henry and to Charles Pollack as Charles.

The record shows that Henry paid the monthly payments of $416.66⅔ as they became due to Charles from the time the contract was made, up to January 1, 1912, when he reduced such payments to very small sums. It seems that Charles made no demand for full payment during this time. In 1919 Henry began paying Charles $250 per month and kept this up until May, 1926, when he ceased paying the $250 per month because Charles refused to accept such monthly payments in full satisfaction of the amount due on the contract. Henry then wholly repudiated the contract, and the suit followed. The pleadings of both parties are very voluminous, but we hold them sufficient to raise the issues discussed by us. We here pause to remark that the jury, in response to appropriate issues, found that the $250 monthly payments ceased in May, 1926, and that no new agreement was made between Henry and Charles by the terms of which the original contract was altered. The verdict contained other findings not necessary to mention here.

The trial court rendered judgment denying Charles any interest in the real and personal property described in his petition, but gave him judgment against Henry for $58,601.22, being the unpaid balance due upon the contract from January 1, 1912, to date of judgment; also for $31,177.31, accrued interest on such above sum; also Charles was awarded judgment against Henry for $52,600 as the present value of the $5,000 agreed to be paid during each year in monthly installments of $416.66⅔ each, under the terms of the written contract, such value being computed on the basis of 4 per cent. on the life expectancy of Charles. No judgment was awarded based on the value of the $100,000 due Charles in the event he should outlive Henry.

From the above judgment Henry appealed to the Court of Civil Appeals at Dallas, but, on equalization of the dockets of the several Courts of Civil Appeals, the cause was transferred to the Court of Civil Appeals at El Paso, which court affirmed the judgment of the trial court, except it held that all of Charles' claim against Henry based on monthly payments which matured more than four years prior to the filing of the suit was barred by the four-year statute of limitation, and reversed and rendered that part of the judgment of the trial court which was in conflict with such holding. Both parties were dissatisfied with the rulings and judgment of the Court of Civil Appeals and prosecuted writs of error to the Supreme Court. Both writs were granted. The record, briefs, and arguments are very voluminous, but we shall content ourselves with a general discussion of those matters which, in our opinion, settle the litigation.

### Opinion.

We agree with the Court of Civil Appeals that the only material questions presented by this appeal are: (a) The question of limitation; and (b) the measure of damages for the breach of the above contract. In this connection we think the verdict of the jury and the evidence conclusively establish a complete breach which occurred May, 1926. In other words, the complete repudiation by Henry occurred at that time.

With reference to the issue of limitation we agree with the holding of the Court of Civil Appeals to the effect that all payments due by Henry to Charles which matured more than four years prior to August 5, 1926, when the suit was filed, are barred by the four-year statute of limitation (Rev. St.

1925, art. 5527). Under the contract these payments were due and payable each month, and limitation would begin to run on each payment due from its due date. We find nothing in the record that would prevent the application of the statute to these sums.

The evidence in the case conclusively shows that Henry has not made the full payments due Charles since January, 1912, and in May, 1926, absolutely repudiated his obligation under the contract. The verdict of the jury establishes the fact that Henry had no legal excuse for failing to meet the monthly payment provided in the contract, and no legal excuse for his repudiation of the contract. Furthermore we think that, in the absence of any jury finding, the evidence absolutely establishes the fact that Henry has failed to meet the payments due under the contract without legal excuse, and that he, without just cause, has repudiated his obligation to carry out the contract as written. We therefore now come to decide the rights of the parties at the time of trial in the district court, treating the contract as breached and completely repudiated. This brings us to the question of the measure of damages due by Henry to Charles.

The contract is rather unique, but very plain. Its performance would have been very simple. However, the contract was not performed, but breached, and this suit is for damages for the breach.

█ In this connection we hold that Henry, having not only failed and refused to meet the monthly payments due on the contract, but, on the other hand, having absolutely repudiated the obligation, all without just excuse, has breached the contract, and therefore Charles is entitled to maintain his action in damages at once for the entire breach, and is entitled in one suit to receive in damages the present value of all that he would have received if the contract had been performed, and he is not compelled to resort to repeated suits to recover the monthly payments. Pierce v. Tenn. C. I. & R. Co., 173 U. S. 1, 19 S. Ct. 335, 339, 43 L. Ed. 591 (cited by Court of Civil Appeals); Roehm v. Horst, 178 U. S. 1, 20 S. Ct. 780, 788, 44 L. Ed. 953; Greenwall, etc., v. Markowitz, 97 Tex. 479, 79 S. W. 1069, 1071, 65 L. R. A. 302; Moore v. Jenkins, 109 Tex. 461, 211 S. W. 975, 976; 13 C. J. page 651, par. 725; 6 R. C. L. p. 1023, par. 384.

In the Pierce Case, supra, it is shown that one Pierce, while in the employ of Tennessee Coal, Iron & Railroad Company, was injured. Pierce claimed damages against the company. The company made a contract of settlement with Pierce, the principal provision of which required the company to pay Pierce $65 per month for the term of his life. Pierce was to continue to perform such services for the company as his crippled condition would permit. The company breached the contract by discharging Pierce, refusing to pay the monthly wages, and repudiating its liability on the contract. The Supreme Court of the United States, speaking through Justice Gray, upheld the right of Pierce to recover, as damages for the breach of the contract, the present value thereof at the time of trial based upon his life expectancy. We quote the following from this opinion:

"Upon this point the authorities are somewhat conflicting; and there is little to be found in the decisions of this court having any bearing upon it, beyond the affirmance of the general propositions that 'in an action for a personal injury the plaintiff is entitled to recover compensation, so far as it is susceptible of an estimate in money, for the loss and damage caused to him by the defendant's negligence, including, not only expenses incurred for medical attendance, and a reasonable sum for his pain and suffering, but also a fair recompense for the loss of what he would otherwise have earned in his trade or profession, and has been deprived of the capacity of earning by the wrongful act of the defendant,' and, 'in order to assist the jury in making such an estimate, standard life and annuity tables, showing at any age the probable duration of life, and the present value of a life annuity, are competent evidence' (Vicksburg & M. Railroad Co. v. Putnam, 118 U. S. 545, 554, 7 S. Ct. 2, 30 L. Ed. 257, 258); and that in an action for breach of contract 'the amount which would have been received, if the contract had been kept, is the measure of damages if the contract is broken' (Benjamin v. Hillard, 23 How. 149, 167, 16 L. Ed. 518. 522).

"But the recent tendency of judicial decisions in this country, in actions of contract as well as in actions of tort, has been towards allowing entire damages to be recovered, once for all, in a single action, and thus avoiding the embarrassment and annoyance of repeated litigation. This especially appears by well-considered opinions in cases of agreements to furnish support or to pay wages, a few only of which need be referred to.

"In Parker v. Russell, 133 Mass. 74, the declaration alleged that, in consideration of a conveyance by the plaintiff to the defendant of certain real estate, the defendant agreed to support him during his natural life, and that the defendant accepted the conveyance, and occupied the real estate, but neglected and refused to perform the agreement. The plaintiff proved the contract, and introduced evidence that the defendant did support him in the defendant's house for five years, and until the house was destroyed by fire, and has since furnished him no aid or support. The jury were instructed that 'if the defendant for a period of about two years neglected to furnish aid or support to the plaintiff, without any fault of the plaintiff, the plaintiff might treat the contract as at an end, and recover damages for the breach of

the contract as a whole, and that the plaintiff would be entitled to recover compensation for the past failure of the defendant to furnish him aid and support, and full indemnity for his future support.' Exceptions taken by the defendant to this instruction were overruled by the supreme judicial court of Massachusetts. Mr. Justice Field, in delivering judgment, said: 'In an action for the breach of a contract to support the plaintiff during his life, if the contract is regarded as still subsisting, the damages are assessed up to the date of the writ, and not up to the time when the verdict is rendered. But if the breach has been such that the plaintiff has the right to treat the contract as absolutely and finally broken by the defendant, and he so elects to treat it, the damages are assessed as of a total breach of an entire contract. Such damages are not special or prospective damages, but are the damages naturally resulting from a total breach of the contract, and are suffered when the contract is broken, and are assessed as of that time. From the nature of the contract, they include damages for not performing the contract in the future as well as in the past. The value of the contract to the plaintiff at the time it is broken may be somewhat indefinite, because the duration of the life of the plaintiff is uncertain; but uncertainty in the duration of a life has not, since the adoption of life tables, been regarded as a reason why full relief in damages should not be afforded for a failure to perform a contract which by its terms was to continue during life. When the defendant, for example, absolutely refuses to perform such a contract, after the time for entering upon the performance has begun, it would be a great hardship to compel the plaintiff to be ready, at all times during his life to be supported by the defendant, if the defendant should at any time change his mind, and to hold that he must resort to successive actions from time to time to obtain his damages piecemeal, or else leave them to be recovered as an entirety by his personal representatives after his death.' "

Further in the same opinion the court holds:

"The complaint alleged, and the plaintiff at the trial introduced evidence tending to prove, that by those injuries he was permanently disabled; that he was always ready and offered to do for the defendant such work as he was able to do, and labored at that work for such reasonable time as he was able to work and bound to work under the contract; and that the defendant, without any reasonable ground therefor, denied its obligation to pay the plaintiff the stipulated wages longer than suited its pleasure, and, for six months before the commencement of the action, disregarded the contract, and refused to abide by it, and entirely abandoned the contract, and dismissed the plaintiff from its service.

"If these facts were proved to the satisfaction of the jury, the case would stand thus: The defendant committed an absolute breach of the contract at a time when the plaintiff was entitled to require performance. The plaintiff was not bound to wait to see if the defendant would change its decision and take him back into its service, or to resort to successive actions for damages from time to time, or to leave the whole of his damages to be recovered by his personal representative after his death. But he had the right to elect to treat the contract as absolutely and finally broken by the defendant; to maintain this action, once for all, as for a total breach of the entire contract; and to recover all that he would have received in the future, as well as in the past, if the contract had been kept. In so doing, he would simply recover the value of the contract to him at the time of the breach, including all the damages, past or future, resulting from the total breach of the contract. The difficulty and uncertainty of estimating damages that the plaintiff may suffer in the future is no greater in this action of contract than they would have been if he had sued the defendant, in an action of tort, to recover damages for the personal injuries sustained in its service, instead of settling and releasing those damages by the contract now sued on."

In the Pierce Case, Justice Gray reviews at great length the authorities on the question, and cites and discusses, among others, Parker v. Russell, 133 Mass. 74; Schell v. Plumb, 55 N. Y. 592; East Tenn., V. & G. R. Co. v. Staub, 7 Lea (Tenn.) 397. All of these cases announce the same doctrine announced by Justice Gray in the Pierce Case, both as to the right to recover damages for the breach of the entire contract and the power of the court to ascertain the life expectancy.

In the Roehm Case, supra, the Supreme Court of the United States, speaking through Chief Justice Fuller, again affirmed the rule in the Pierce Case, and held that an unqualified and positive refusal to perform a contract, though the entire performance thereof is not yet due, may, if the renunciation goes to the entire contract, be treated as a complete breach, and will entitle the injured party to at once bring his action. The court then proceeds to hold that the measure of damages in such a case is that the injured party "is entitled to compensation based, as far as possible, on the ascertainment of what he would have suffered by the continued breach of the other party down to the time of complete performance, less any abatement by reason of circumstances of which he ought reasonably to have availed himself." This case cites with approval the opinion in the Pierce Case, supra.

In the Greenwall Case, supra, our Supreme Court, speaking through Associate Justice Wil-

liams, in effect announced the same rule in the following language:

"'The law with reference to a contract to be performed at a future time, where the party bound to performance announces prior to the time his intention not to perform it, as established by the cases of Hochster v. De la Tour [2 E. & B. 678, 22 L. J. (Q. B.) 455], and the Danube and Black Sea Co. v. Xenos [13 C. B. (N. S.) 825, 31 L. J. (C. P.) 284], on the one hand, and Avery v. Bowden [5 E. & B. 714, 26 L. J. (Q. B.) 3], Reid v. Hoskins [6 E. & B. 953, 26 L. J. (Q. B.) 5], and Barwick v. Buba [2 C. B. (N. S.) 563, 26 L. J. (C. P.) 280], on the other, may be thus stated: The promisee, if he pleases, may treat the notice of intention as inoperative, and await the time when the contract is to be executed, and then hold the other party responsible for all the consequences of nonperformance; but in that case he keeps the contract alive for the benefit of the other party as well as his own. He remains subject to all his own obligations and liabilities under it, and enables the other party not only to complete the contract, if so advised, notwithstanding his previous repudiation of it, but also to take advantage of any supervening circumstance which would justify him in declining to complete it.

"'On the other hand, the promisee may, if he thinks proper, treat the repudiation of the other party as a wrongful putting an end to the contract, and may at once bring an action as on a breach of it; and in such action he will be entitled to such damages as would have arisen from the nonperformance of the contract at the appointed time, subject, however, to abatement in respect of any circumstances which may have afforded him the means of mitigating his loss.'

"When the promisee adopts the latter course, treating the contract as broken, and himself as discharged from his obligations under it, he resolves his right into a mere cause of action for damages. He is no longer concerned with the disposition which the promissor may make of the subject-matter of the contract. Kadish v. Young, 108 Ill. 170, 43 Am. Rep. 548; Johnstone v. Milling, 16 Q. B. Div. 467; Roper v. Johnson, L. R. 8 C. P. 167; Roehm v. Horst, 178 U. S. 1, 20 S. Ct. 780, 44 L. Ed. 953; Anson on Const. 368 et seq., and authorities cited; Cyclopedia Law and Procedure, 635–637, and authorities cited."

In Moore v. Jenkins, supra, our own Supreme Court speaking through Judge Greenwood, again announced the same doctrine in the following language: "The effect of an express and unconditional renunciation of his contract, by defendant in error, was to entitle plaintiffs in error to treat the contract as terminated if they so desired."

Judge Greenwood then proceeds to quote the following from the opinion of Judge Brown in Kilgore v. Baptist Educational Association, 90 Tex. 139, see page 142, 37 S. W. 598: "The intention to abandon the contract at some future date is no breach of it, but, when that intention is declared in positive terms and unconditionally, it has the effect, in so far as the promisor is able to do so, to repudiate the contract itself and to terminate the contractual relations between the parties. This affords to the other party the opportunity to accept the declarations, if he chooses to do so, and thus make effective the declarations of intention not to perform, rendering the contract thereby one that is broken on the part of the promisor himself. But to have this effect the declaration of an intention not to perform the contract in the future must be unconditional in its terms. Benj. Sales, § 568; U. S. v. Smoot, 15 Wall, 36 [21 L. Ed. 107]; Dingley v. Oler, 117 U. S. 490, 6 S. Ct. 850 [29 L. Ed. 984]. In his work on Sales, Mr. Benjamin, in the section cited above, says: 'But a mere assertion that the party will be unable or will refuse to perform his contract is not sufficient. It must be a distinct and unequivocal absolute refusal to perform the promise, and must be treated and acted upon as such by the party to whom the promise was made; for, if he afterwards continue to urge or demand compliance with the contract, it is plain that he does not understand it to be at an end.' This language was approved by the supreme court of the United States in the case of U. S. v. Smoot, supra."

In 13 C. J. p. 651, supra, the rule is thus announced: "Where a party bound by an executory contract repudiates his obligation before the time for performance, the promisee has according to the great weight of authority, an option to treat the contract as ended so far as further performance is concerned, and to maintain an action at once for the damages occasioned by such anticipatory breach. The rule is the same whether the contract is wholly executory or has been partially executed."

In 6 R. C. L. p. 1023, supra, the same rule is announced as in the other authorities above cited and quoted from.

Having determined that Henry has completely breached his contract by absolutely repudiating his obligation and duty to carry it out, and having determined that Charles is entitled to maintain his action in damages for the entire breach, and having announced the measure of such damages to be the present value at the time of trial of all that he would have received if the contract had been performed, we shall now proceed to define such damages by applying the rule announced to the facts of this case.

Simply stated, the contract, as above shown, obligates Henry to pay Charles $5,000 per year in monthly installments of $416.66⅔ each, as long as Charles lives, provided Henry

outlives Charles, and in such event these monthly payments fully satisfy the contract. However, in the event Charles outlives Henry, Henry must pay to Charles the $5,000 per year, in the same monthly installments until the death of Henry, and in addition thereto Henry's estate will owe Charles $100,000. As stated by the Court of Civil Appeals, it is impossible to actually tell, with certainty, which of these parties will die first, but such fact does not prevent the court from ascertaining such fact.

■ Under the authorities above cited, we think the event of which will die first is, in law, no more uncertain than the expected length of time that each will live. Also, as above stated, the fact that the time of death is uncertain does not prevent the court from ascertaining such event and awarding damages based upon such ascertainment. According to the findings of the Court of Civil Appeals, and the uncontradicted evidence, the life expectancy of Charles at the time of trial was 14.74 years and that of Henry 11.67 years. It follows that, in so far as this litigation is concerned, it is determined that Charles will outlive Henry. Pierce v. Company, supra. Henry having wrongfully breached the contract, Charles is entitled to recover such amount in damages, based upon the conclusion that Henry will die first, which if paid at the time of trial, will fully compensate Charles for what he would have received had the contract been performed according to its terms.

The Court of Civil Appeals holds that it is absolutely impossible to determine the present value of the $100,000.00 payable by Henry's estate to Charles in the event Henry should die first, because it is wholly uncertain who will die first. The Court of Civil Appeals cites in support of this holding the case of Dunbar v. Dunbar, 190 U. S. 340, 23 S. Ct. 757, 47 L. Ed. 1084. We think this case not only does not support the holding, but is authority to the contrary. The Dunbar Case involved a contract by the terms of which a man agreed to pay his divorced wife the sum of $500 yearly so long as she remained unmarried. The Supreme Court of the United States held that it was impossible to estimate or value this contract because of the provision that it ended on the termination of widowhood, and this could be accomplished either by death or remarriage. The court then proceeded to expressly hold that, if the contract terminated by death, it could be valued by reference to the mortality tables, but no such tables or statistics existed by which the time or event of remarriage could be estimated. We have no such case here. The life expectancies of both Henry and Charles are fully established, and, according to such expectancies, Henry will precede Charles in death. We can see no consistency, in applying the rule of expectancy to ascertain the length of time Charles will live and refusing to do so to ascertain the length of Henry's life. In other words, when the rule is once applied, it should be carried throughout the case, and, when this is done, no trouble is encountered in determining, for the purposes of the case, who will die first.

From what we have said, it follows that the district court should have rendered the following judgment:

(a) Charles should have recovered against Henry for the balance unpaid on all monthly payments maturing under the contract within four years prior to the filing of the suit and up to the date of judgment, with interest thereon from the due date of each payment to the date of judgment, which was June 5, 1928, at the rate of 6 per cent. per annum.

(b) Charles should have recovered judgment against Henry for the present worth of all monthly payments to become due on the contract after the date of judgment, June 5, 1928, to the date of Henry's expected death, which date is 11.67 years from the date of judgment. In computing the present worth of such future payments, same should have been discounted to their present worth at the date of judgment at 6 per cent. interest per annum.

(c) Charles should have recovered judgment against Henry for the present worth at the time of judgment, June 5, 1928, of the $100,000 which Henry's estate will owe Charles at the time of Henry' death, which time is 11.67 years from the date of judgment. In computing the present worth at the time of judgment of such $100,000, same should have been discounted to its present worth at the time of judgment at 6 per cent. interest per annum.

(d) When the net amount of the above three sums has been arrived at, judgment should have been entered in favor of Charles and against Henry for such amount, and such net total sum should bear 6 per cent. interest from June 5, 1928, until paid.

(e) The judgment denying Charles any interest in the properties described in his petition is correct.

We therefore recommend as follows:

(1) That the judgments of the Court of Civil Appeals and district court in so far as they deny Charles any recovery of the properties described in his petition be affirmed.

(2) That the judgments of both of such lower courts be reversed and set aside in all other respects.

(3) That judgment be here rendered in favor of Charles against Henry as of date June 5, 1928, for the total net sum produced by (a), (b), and (c), above, with 6 per cent. interest from June 5, 1928.

(4) That judgment be here rendered in favor of Charles against Henry for all costs in all courts.

(5) That this cause be remanded to the district court with instructions to that court to make the proper calculations to ascertain the amount of Charles' money recovery against Henry as above rendered, and then to enter judgment in that court for the amount produced by such calculations, all as of date June 5, 1928.

CURETON, C. J.

Judgments of the district court and Court of Civil Appeals both reversed, and cause remanded to the district court, with instructions, as recommended by the Commission of Appeals.

We approve the holdings of the Commission of Appeals on the questions discussed in its opinion.